UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ROCHESTER DRUG CO-OPERATIVE, INC.

Plaintiff,

v.

BIOGEN IDEC U.S. CORPORATION

Defendant.

**DECISION AND ORDER**

6:15-CV-6388 EAW

## INTRODUCTION

Plaintiff Rochester Drug Co-operative, Inc. ("Plaintiff") has sued Defendant Biogen Idec U.S. Corporation ("Defendant")[1] in connection with Defendant's termination of a distribution contract with Plaintiff. Plaintiff alleges that Defendant's termination decision was the product of unlawful arrangements reached between Defendant and three prominent national wholesalers to restrain trade in the sale of Avonex, a pharmaceutical drug manufactured by Defendant.

Plaintiff's Complaint against Defendant asserts five causes of action arising out of Defendant's termination of its distribution contract with Plaintiff: (1) violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340; (2) injunctive relief under N.Y. CPLR 6301; (3) anticipatory breach of contract; (4) breach of the covenant of good faith and fair dealing; and (5) declaratory relief under N.Y. CPLR 3001. (Dkt. 1).

---

[1]     As of March 27, 2015, Defendant now operates under the corporate name Biogen Inc. (Dkt. 6-1 at 6 & n.1).

Defendant has moved to dismiss the entire Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. 6). Plaintiff has moved for a preliminary injunction, restraining Defendant from taking any steps in furtherance of the termination decision. (Dkt. 9, 15). The Court held oral argument on September 15, 2015, and reserved decision.

The Court is sensitive to the potential adverse impacts that Defendant's termination decision may have on Defendant's former regional wholesalers including Plaintiff, the local and independent pharmacies they service, and the pharmacies' patients, particularly those living in rural areas. The indisputable trend in the pharmaceutical industry, as reflected in Defendant's decision and similar decisions made by countless other pharmaceutical manufacturers, is to distribute drugs through mammoth-sized wholesalers. As a result, the local community drug store, where prescriptions are filled while folks visit with their pharmacist and neighbors, appears to be fading from our society, and their customers are increasingly being forced to obtain their pharmaceuticals through other means.

Nevertheless, the law permits corporations to make these types of distribution decisions without regard to societal impact, so long as they do not engage in an unlawful bilateral arrangement for anticompetitive purposes. Because Plaintiff's Complaint fails to plausibility allege that Defendant's termination decision was the product of an unlawful reciprocal arrangement, Defendant's motion to dismiss (Dkt. 6) is granted and Plaintiff's Complaint (Dkt. 1) is dismissed in its entirety. Plaintiff's motion for preliminary injunction (Dkt. 9) is denied.

## BACKGROUND

### I.    The Parties

Plaintiff is a wholesale drug cooperative that buys and distributes a complete line of pharmaceuticals and home health supplies to community retail pharmacies, long-term care pharmacies, and home health care stores. (Dkt. 1, Compl. ¶ 5). Plaintiff's customers are located primarily in New York, New Jersey, Pennsylvania, and Ohio, in both metropolitan and rural areas of those states. (*Id.* ¶ 6).

Defendant is a biotechnology corporation that develops, markets, and sells pharmaceutical products, including the drug Avonex. (*Id.* ¶ 7).

### II.    The Drug Avonex

Avonex treats "patients with relapsing forms of multiple sclerosis ('MS') to delay the progression of physical disability and reduce 'flare ups' of MS symptoms." (*Id.* ¶ 10). Avonex is the only interferon beta on the market that is administered through intramuscular injection as opposed to a subcutaneous injection. (*Id.* ¶ 41). Avonex needs to be administered only once a week. (*Id*).

Avonex is sold in three formulations. The Avonex Pre-Filled Syringe is a conventional syringe. (*Id.* ¶ 10). The Avonex Powder Form is a lyophilized vial of powder that is manually mixed before injection. (*Id.*). The Avonex Pen is a prefilled needle that can be administered with a single click and "was designed to improve a patient's ability to self-administer Avonex." (*Id.* ¶ 13). According to Plaintiff, "[f]or many patients, Avonex is administered by licensed pharmacists in pharmacies." (*Id.* ¶ 15).

## III.    The Big Three

Three wholesalers generate 85 to 90 percent of all revenues from drug distribution in the United States. (*Id.* ¶ 34). Those three wholesalers are Cardinal Health, McKesson Corporation, and AmerisourceBergen Corporation (commonly known as, and collectively referred to herein as, the "Big Three"). (*Id.*). They are the largest drug wholesalers in the nation. (*Id.*). The great majority of all pharmacies in the United States, including all of the large retail pharmacy chains, receive pharmaceuticals from the Big Three. (*Id.* ¶ 22).

The Big Three supply only to pharmacies that purchase a minimum volume amount of pharmaceuticals. (*Id.* ¶ 25). Many of the smaller pharmacy chains and independent pharmacies serviced by regional wholesalers like Plaintiff lack the volume requirements to purchase pharmaceuticals from the Big Three. (*Id.* ¶¶ 24-25).

## IV.    The Wholesaler Distribution Agreement

On or about January 1, 2009, Plaintiff and Defendant entered into a Wholesaler Distribution Agreement (the "Distribution Agreement"), which was supplemented by Defendant's letter dated March 14, 2012, whereby Plaintiff was appointed as an authorized wholesaler of Defendant's Avonex products. (*Id.* ¶¶ 17-21). Plaintiff has performed under the Distribution Agreement for over six years. (*Id.* ¶ 19).

## V.    Termination of the Distribution Agreement

By letter dated March 23, 2015, Defendant informed Plaintiff that it was terminating the Distribution Agreement, effective June 30, 2015 (the "Termination Letter"). (*Id.* ¶ 29). The Termination Letter stated that as of July 1, 2015, Avonex would be available for purchase only from the Big Three. (*Id.* ¶ 33). The Termination Letter

also stated that Plaintiff could continue to sell Avonex out of its existing inventory for a period not to exceed 90 days from the date of termination. (*Id.* ¶ 54; Dkt. 6-4 at 2).

## VI.    Allegations of Unlawful Arrangement

Plaintiff's allegations of unlawful arrangement are located in paragraphs 52 through 56 of the Complaint. In paragraphs 52 and 53, Plaintiff alleges that Defendant's Termination Letter demonstrates that Defendant has entered into an agreement or arrangement with the Big Three to exclude all other wholesalers, including Plaintiff, from the relevant market, which is alleged to be "Avonex in all strengths and forms" in the United States. (Dkt. 1, Compl. ¶¶ 41, 52-53). In paragraph 54, Plaintiff alleges that Defendant's 90-day limit on the time by which Plaintiff must stop selling Avonex was instituted to protect the Big Three's sales and profits. (*Id.* ¶ 54).

In paragraph 55, Plaintiff alleges that Defendant's decision to terminate the regional wholesalers was against Defendant's economic interests, because pharmacies in mostly rural areas will no longer be able to obtain Avonex, which will cause Defendant to lose sales. (*Id.* ¶ 55). Elsewhere in the Complaint, Plaintiff asserts that these small pharmacies might not be able to obtain Avonex due to one or more of the following reasons: (1) the inability to meet the volume requirements of the Big Three; (2) the inability to pay the fees of the Big Three on a profitable basis; and/or (3) the inability to obtain needed services from the Big Three. (*Id.* ¶¶ 25-26).

In paragraph 56, Plaintiff alleges that the unlawful arrangement will restrict output and increase the cost of Avonex and, in some areas, access to Avonex will be eliminated. (*Id.* ¶ 56). Elsewhere in the Complaint, Plaintiff adds that the purpose of Defendant's

actions in reducing the output of Avonex is to "increas[e] already supracompetitive margins for its Avonex monopoly." (*Id.* ¶ 68).

## VII. Procedural History

Plaintiff commenced this action in state court on June 25, 2015. (Dkt. 1, Notice of Removal ¶ 1). Defendant timely removed the action to this Court on June 26, 2015, based upon diversity jurisdiction. (*Id.* ¶ 6). On July 17, 2015, Defendant filed a motion to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. 6). On August 7, 2015, Plaintiff filed its original motion for a preliminary injunction (Dkt. 9), and, on August 10, 2015, Plaintiff filed an amended motion for preliminary injunction (Dkt. 15). The parties filed their response papers (Dkt. 18, 20) and reply papers (Dkt. 21, 23), as well as supporting declarations and exhibits. Oral argument was held on September 15, 2015, and the Court reserved decision.

## DISCUSSION

## I. Legal Standard

Rule 8 of the Federal Rules of Civil Procedure provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The factual allegations in a complaint "must be enough to raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks and brackets omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

The plausibility standard "asks for more than a sheer possibility" that a defendant has acted unlawfully. *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The "[d]etermin[ation] [of] whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. However, plausibility is a standard lower than probability. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012). A given set of actions may well be subject to diverging interpretations, each of which is plausible, and the choice between or among plausible inferences or scenarios is one for the factfinder. *Id.* A court may not dismiss a complaint that states a plausible version of the events merely because the court finds that a different version is more plausible. *Id.* at 185.

"[T]o be viable, a complaint must contain 'enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made.'" *In re*

*Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at

556). While *Twombly* does not require heightened pleading of specifics, it does require

enough facts to "nudge [P]laintiff['s] claims across the line from conceivable to

plausible." *Id.* (citing *Twombly*, 550 U.S. at 570).[2]

---

[2]     In its papers submitted to the Court, Defendant argued that the Complaint in this case failed to meet the pleading requirements of Rule 8(a) due to the absence of any allegations identifying the "specific time, place, or person" involved in the alleged arrangement. (Dkt. 6-1 at 14 (quoting *Twombly*, 550 U.S. at 565 n.10)). *Twombly* does not require those factual allegations in a case premised upon circumstantial evidence, like this one. In *Twombly*, the plaintiffs attempted to state an antitrust claim under § 1 of the Sherman Act based upon an allegation that the defendants engaged in parallel behavior; the plaintiffs did not rest their claim on any independent allegation of actual agreement among the defendants. 550 U.S. at 564. The *Twombly* Court stated that any allegation of actual agreement was merely a "legal conclusion[ ] resting on the prior allegations," *id.* at 564, and that the actual factual allegations in the complaint were insufficient because they did not "invest[ ] either the action or inaction alleged with a plausible suggestion of conspiracy," *id.* at 566. In a footnote, the Court hypothesized that had the plaintiffs rested their claim on direct evidence of an agreement, the complaint would not have given the notice required by Rule 8 because "the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies." *Id.* at 565 n.10.

Hence, under *Twombly*, while a Sherman Act § 1 complaint premised on direct evidence of an agreement requires "time, place, or person" allegations regarding the claimed illegal agreement, complaints premised on circumstantial evidence, which are the lion's share of the pleadings in the antitrust arena, do not require such factual matter. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) (rejecting defendants' argument that *Twombly* requires a plaintiff resting on allegations of parallel conduct to identify the specific time, place, or person related to each conspiracy allegation); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 687 (S.D.N.Y. 2012) ("'[P]laintiffs are not required to mention a specific time, place or person involved in their conspiracy allegation' so long as it provides sufficient circumstantial evidence of agreement." (quoting *Starr*, 592 F.3d at 325) (original brackets omitted)).

Applying the pleading standards set forth in *Twombly* to Plaintiff's antitrust claim of unlawful arrangement under the Donnelly Act, the Court cannot agree with Defendant's position that "time, place, or person" allegations are required to survive Defendant's motion to dismiss. The Court reads Plaintiff's claim as one resting on circumstantial evidence. Plaintiff claims that an assumption of an unlawful arrangement to restrain trade can be inferred from the perceived economic effects flowing from Defendant's abandonment of Plaintiff's distributorship, to wit, the financial benefits

## II. Plaintiff's Donnelly Act Claim

Plaintiff alleges that Defendant's decision to discontinue its distributorship relationship with Plaintiff violates New York's antitrust statute, commonly known as the Donnelly Act, N.Y. Gen. Bus. Law § 340. The Donnelly Act declares "[e]very contract, agreement, arrangement or combination whereby . . . [c]ompetition . . . in the conduct of any business, trade or commerce . . . is or may be restrained . . . to be against public policy, illegal and void." N.Y. Gen. Bus. Law § 340.[3] For the reasons stated below, the Court concludes that the Complaint does not allege sufficient facts to raise a plausible inference of a "contract, agreement, arrangement or combination" between two or more entities as required to state a claim for relief under the Donnelly Act. *Id.*

### A. The Donnelly Act

Plaintiff appears to suggest that "a unilateral exertion of power" is sufficient to fall within the scope of the Donnelly Act. (Dkt. 18 at 18). The Court cannot agree. The United States Supreme Court has long held that "[a] manufacturer . . . generally has a right to . . . refuse to deal[] with whomever it likes, as long as it does so independently."

---

inuring to the Big Three through an expanded wholesale market and the alleged financial losses resulting to Defendant through elimination of the regional distributor. Because Plaintiff has not rested its antitrust claim on direct evidence of an arrangement, Plaintiff need not allege the specific time, place, or persons involved in the alleged arrangement. Indeed, at oral argument, Defendant conceded that time, place, or person allegations are not required in the Complaint in this case for these same reasons.

[3] "A party asserting a violation of the Donnelly Act must (1) identify the relevant product market, (2) describe the nature and effects of the purported conspiracy, (3) allege how the economic impact of that conspiracy is to restrain trade in the market in question, and (4) show a conspiracy or reciprocal relationship between two or more entities." *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 678 (S.D.N.Y. 2002).

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  This principle is often referred to as the "Colgate doctrine," after the United States Supreme Court's decision.  "Under Section 340 of the General Business Law [of New York,] it has likewise been consistently held that an individual's refusal to sell to anyone does not amount to prohibited restraint of trade."  *Dior v. Milton*, 9 Misc. 2d 425, 442 (Sup. Ct. 1956), *aff'd*, 2 A.D.2d 878 (1st Dep't 1956).

The Donnelly Act does not proscribe unilateral action, but only a "contract, agreement, arrangement or combination" in restraint of trade.  N.Y. Gen. Bus. Law § 340.  In *State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 464 (1976), the Court of Appeals of New York interpreted the Donnelly Act to require the existence of a "reciprocal relationship of commitment between two or more legal or economic entities" before liability may be found.  Thus, while a bilateral agreement or commitment falls within the scope of the Donnelly Act, "a one-sided practice . . . is outside the scope of the statute." *Id.*

In making the case that unilateral conduct suffices under the statute, Plaintiff heavily relies upon *People v. B.P. Oil Corp.*, 80 Misc. 2d 566 (Sup. Ct. 1975), which predates the Court of Appeals' opinion in *Mobil Oil*.  In *B.P. Oil*, the court opined that while the statute could be read to require a bilateral arrangement by two or more parties, "the tone of the statute is broad enough to reach the unilateral exertion of power by the defendant in stifling competition." *Id.* at 568.  Applying that understanding of the statute, the court concluded that the defendant, through its "superior economic position," could

unilaterally violate the Donnelly Act by "carefully calculated confiscatory acts" that could lead to the destruction of competition. *Id.*

The holding in *B.P. Oil*, which appears to be that a unilateral exertion of power may fall within the Donnelly Act, does not reflect the current state of the law in New York, and, therefore, the Court does not accord it any precedential weight. *Mobil Oil* flatly rejected the idea that a unilateral exertion of power can state a claim under the Donnelly Act when it stated that "a one-sided practice . . . is outside the scope of the statute." 38 N.Y.2d at 464.

Although a unilateral exertion of power does not fall within the Donnelly Act, Plaintiff is correct in arguing that the inclusion of the word "arrangement" in the Donnelly Act makes the scope of the antitrust statute broader than § 1 of the Sherman Act.[4] (Dkt. 18 at 15-19). The inclusion of the word "arrangement" in the list of proscriptions implies a reciprocal relationship of commitment similar to, but not synonymous with, a formal agreement:

> [U]nder the familiar canon of statutory construction, *noscitur a sociis*, the term, "arrangement", takes on a connotation similar to that of the other terms with which it is found in company, and thus must be interpreted as contemplating a reciprocal relationship of commitment between two or more legal or economic entities similar to but not embraced within the more exacting terms, "contract", "combination" or "conspiracy".

---

[4]     Under the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The Donnelly Act is generally patterned after the Sherman Act and is otherwise construed in light of federal precedent. *Great Atl. & Pac. Tea Co. v. Town of E. Hampton*, 997 F. Supp. 340, 352 (E.D.N.Y. 1998).

*Mobil Oil*, 38 N.Y.2d at 464.

Thus, to fall within the ambit of the Donnelly Act, a jilted distributor may not rely only upon a manufacturer's unilateral exertion of power to terminate a distributorship. On the other hand, the jilted distributor need not allege a formal agreement or conspiracy, so long as the arrangement to restrain trade involves a "reciprocal relationship of commitment" between two or more entities.[5] *Id.*

---

[5]      Contrary to Defendant's apparent suggestion otherwise (Dkt. 6-1 at 11-12), an allegation that Defendant performed overt acts in furtherance of the alleged arrangement is not required to allege a Donnelly Act claim. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ("[I]t is likewise well settled that conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring."). Although *Socony-Vacuum Oil* involved a Sherman Act claim, the reasoning applies with equal force to a Donnelly Act claim. The case cited by Defendant for the proposition that allegations of overt acts are required to state a Donnelly Act claim to survive a motion to dismiss, which is *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 371 (S.D.N.Y. 2012) (quoting *Tese–Milner v. Diamond Trading Co., Ltd.*, No. 04–CV–5203, 2011 WL 4501336, at *5 (S.D.N.Y. Sept. 29, 2011) (quoting *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 484 (S.D.N.Y. 2001))), can be traced to a discussion of the elements required to plead a conspiracy to monopolize claim under § 2 of the Sherman Act. *See Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 484 (S.D.N.Y. 2001) ("In general, the elements of a conspiracy to monopolize claim are (1) proof of concerted action, deliberately entered into with the specific intent to achieve unlawful monopoly power; and (2) the commission of an overt act in furtherance of the conspiracy. To state a claim for relief under § 1 of the Sherman Act, the Carriers must allege that (1) defendants entered into a contract, combination or conspiracy and (2) the conspiracy worked in restraint of trade or commerce among the several states. Under either claim, the Carriers must do more than merely allege the existence of a conspiracy. They must provide some factual support for the allegation of a conspiracy. In the case of a conspiracy to monopolize, claimants must show at least one overt act aimed at accomplishing its anticompetitive objective."). Allegations of an overt act are not required to state a claim based upon an arrangement to restrain trade under the Donnelly Act, because the making of the unlawful arrangement is the prohibited act.

## B.    The Allegations of Plaintiff's Donnelly Act Claim

To survive Defendant's motion to dismiss, Plaintiff must allege facts that make it plausible that Defendant's termination decision was the product of a reciprocal arrangement with the Big Three; unilateral action that might have inured to the benefit of the Big Three is not enough to maintain a Donnelly Act claim. *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 678 (S.D.N.Y. 2002). Plaintiff must allege facts about the behavior of the alleged co-participants from which an inference of a reciprocal arrangement may be drawn. *Du-Bro Foods, Inc. v. Aron Streit Inc.*, No. 2700/93, 1994 WL 874370, at *3 (Sup. Ct. May 18, 1994) (discussing in the context of a Donnelly Act claim that a conspiracy "must be proven by inferences from the behavior of the alleged conspirators"); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183-84 (2d Cir. 2012) ("[C]onspiracies . . . nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators.").[6]

In this case, Plaintiff's Complaint does not set forth any factual matter concerning the behavior of the distributors alleged to be co-participants in the unlawful arrangement with Defendant. The Complaint is completely devoid of any discussions, interactions, or activities of the Big Three in connection with the termination of Plaintiff's

---

[6]    Defendant's suggestion that Plaintiff must plead conspiratorial "communications" to state a plausible claim for relief (Dkt. 6-1 at 13) is somewhat imprecise. Although the Complaint must allege some facts about the behavior (which might include communications) of the participants to make it plausible that an unlawful arrangement was made, Defendant has cited no case that stands for the proposition that meetings and communications are required to state a Donnelly Act claim.

distributorship. The only facts alleged in the Complaint relate to Defendant's action in notifying Plaintiff of the termination of Plaintiff's distributorship. In the absence of any facts concerning the actions of the Big Three, the Court is hard-pressed to infer a reciprocal relationship of commitment between Defendant and any of the Big Three.[7] *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (holding that allegations of conspiratorial activity "in entirely general terms without any specification of any particular activities by any particular defendant . . . was nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever").

Plaintiff attempts to create an inference of an unlawful arrangement by pointing to the Big Three's continued distribution of Defendant's Avonex products after the termination of the regional distributorships and their financial gains from Defendant's distribution change. Plaintiff further asserts that Defendant's distribution plan is against Defendant's own economic interest and gives a list of theoretical discussions which "must have" occurred between Defendant and the Big Three to make the plan an economically sensible one for Defendant. None of these allegations, which are discussed in turn below, raises a plausible suggestion of a reciprocal arrangement of commitment as required under the Donnelly Act.

---

[7]    At oral argument, Plaintiff conceded that the allegations of the Complaint purport to allege only a vertical conspiracy between Defendant and one or more of the Big Three, not a hub-and-spokes conspiracy also involving horizontal arrangements among the Big Three, as hinted by Plaintiff in its filings with the Court. (Dkt. 11 at 18 n.3.)

### 1. Continued Distribution

The law is well settled that a conclusory allegation of an unlawful arrangement is insufficient to state a claim for relief under the Donnelly Act. *See MiniFrame Ltd. v. Microsoft Corp.*, No. 11 CIV. 7419 RJS, 2013 WL 1385704, at *6 (S.D.N.Y. Mar. 28, 2013) ("[C]onclusory allegations of conspiracy are legally insufficient to make out a violation of the Donnelly Act."), *aff'd*, 551 F. App'x 1 (2d Cir. 2013); *Yankees Entm't & Sports Network,* 224 F. Supp. 2d at 678 (same); *Great Atl. & Pac. Tea Co. v. Town of E. Hampton*, 997 F. Supp. 340, 352 (E.D.N.Y. 1998) (same).

In this case, Plaintiff makes the following allegation of an unlawful arrangement in paragraphs 52 and 53 of the Complaint:

> [Defendant's] Termination Letter demonstrates that [Defendant] has entered into an agreement or arrangement with the Three Wholesaler Co-Conspirators to exclude all other wholesalers, including RDC, from the relevant market. The Termination Letter states as follows: "[a]s of July 1, 2015, Avonex will only be available to purchase from AmerisourceBergen, McKesson Corporation and Cardinal Health." Biogen and the Three Wholesaler Co-Conspirators have agreed that all other wholesalers, including RDC, would be terminated as of July 1, 2015.

(Dkt. 1, Compl. ¶¶ 52-53). Contrary to Plaintiff's argument otherwise, the reference to the Big Three in the Termination Letter does not raise a plausible suggestion of an unlawful arrangement. Defendant's decision to streamline its distribution strategy by terminating Plaintiff's distributorship and other regional distributorships was not dependent upon the approval or involvement of any other distributor, including any of the Big Three. Under the terms of the parties' Distribution Agreement, Defendant could unilaterally terminate Plaintiff's distributorship with or without cause upon notice. The

Distribution Agreement specifically provides that "[Defendant] may terminate this Agreement, with or without cause, upon not less than ninety (90) days prior written notice to [Plaintiff]." (Dkt. 6-3 at 18).[8]

That Defendant chose to distribute Avonex through the Big Three does not mean that the Big Three were involved in Defendant's plan to terminate the regional distributorships. Indeed, the Big Three were already authorized to sell Avonex and were already dominant national distributors for Defendant even prior to termination of the regional distributorships. (Dkt. 1, Compl. ¶ 51). The Big Three's continued distribution of Avonex does not provide any insight into whether Defendant's decision to terminate Plaintiff's distributorship was the result of an exertion of unilateral power or stemmed from a reciprocal arrangement with the Big Three. As a result, the Court need not accept as true Plaintiff's conclusory allegation that Defendant and the Big Three "must have" entered into an agreement or arrangement to terminate the regional distributors, including Plaintiff.

---

[8] Neither the Distribution Agreement nor the Termination Letter was attached to Plaintiff's Complaint; instead, Defendant submitted the documents in support of Defendant's Motion to Dismiss. (Dkt. 6-3, 6-4). Subsequently, Plaintiff attached the Distribution Agreement and the Termination Letter in support of its motion for a preliminary injunction. (Dkt. 10-1, 10-3). Because the Distribution Agreement and the Termination Letter are integral to the Complaint, the Court may take the documents into consideration in deciding Defendant's motion to dismiss without converting the motion into a motion for summary judgment. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

## 2.    Financial Gain

Plaintiff asserts that an unlawful arrangement can be reasonably inferred from the mere assertion that the Big Three "have much to gain" from Defendant's new distribution strategy. (Dkt. 18 at 12). In paragraph 54 of the Complaint, Plaintiff alleges that an inference of an unlawful arrangement follows from Defendant's prohibition of sales of Avonex by regional distributors after a 90-day limitation period because the prohibition/limitation allegedly protects the Big Three's sales and profits. (Dkt. 1, Compl. ¶ 54).

Unilateral action is insufficient to support a claimed violation of the Donnelly Act even when the "unilateral action . . . could have the effect of giving one [distributor] an advantage over another." *Hall Heating Co. v. N.Y. State Elec. & Gas Corp.*, 180 A.D.2d 957, 958 (3d Dep't 1992). The mere allegation that Defendant's distribution plan, including the moratorium after 90 days, inured to the benefit of the Big Three does not raise a plausible inference of a reciprocal arrangement. *See Yankees Entm't & Sports Network,* 224 F. Supp. 2d at 678 ("Plaintiff alleges no facts to suggest that Cablevision's refusal to carry YES on reasonable, nondiscriminatory terms or 'control' of the Knicks and Rangers, was the product of a conspiracy or reciprocal arrangement, as opposed to a unilateral act by Cablevision that may have inured to the benefit of FSNY and MSG." (citation omitted)); *Great Atl. & Pac. Tea*, 997 F. Supp. at 352 ("[P]laintiff alleges no fact to suggest that the Superstore Law was the product of a conspiracy or reciprocal arrangement, as opposed to a unilateral act by the Town that may have inured to the benefit of existing retailers."). Because there are insufficient allegations suggesting that

Defendant adopted the new distribution strategy or the 90-day limitation period as part of an arrangement with the Big Three, the Court concludes that the Complaint alleges, at most, a unilateral act by Defendant that may have inured to the benefit of the Big Three.

### 3. Contrary to Defendant's Economic Interest

Plaintiff's antitrust conspiracy theory rests almost entirely on the allegation that Defendant's abandonment of the regional wholesalers was against Defendant's own economic interests. Based upon the theory that Defendant's elimination of regional wholesalers will cause Defendant to lose sales, Plaintiff contends that it has raised a plausible suggestion of conspiracy or unlawful arrangement. In particular, Plaintiff alleges that some small pharmacy chains and independent pharmacies ("mom and pops") might not be able to obtain Avonex due to the high volume requirements of the Big Three and, as a result, Defendant will experience a loss in sales. (Dkt. 1, Compl. ¶¶ 27, 55). In determining the suggestions raised by the effects of the new distribution strategy on Defendant's finances, the Court considers Defendant's distribution strategy in light of the allegations of the Complaint, "common sense," *Iqbal*, 556 U.S. at 679, and "common economic experience," *Twombly*, 550 U.S. at 565. The allegations and those considerations indicate Defendant's new distribution strategy is far from suggestive of a conspiracy.

Plaintiff explains that "mom and pop" pharmacies will likely be unable to obtain Avonex due to one or more of the following reasons: (1) the inability to meet the volume requirements of the Big Three; (2) the inability to pay the fees of the Big Three on a profitable basis; and/or (3) the inability to obtain services from the Big Three. (Dkt. 1,

Compl. ¶¶ 25-26). Plaintiff contends that as a result of the elimination of the regional wholesalers and the concomitant inability of the small pharmacies to carry Avonex, patients, mostly in rural areas, will have their access to Avonex restricted or completely eliminated. However, there are numerous flaws in Plaintiff's theory.

First, and perhaps most significantly, Defendant's distribution plan is not featured in the Complaint as an irrational decision that goes against the sound practices of other manufacturers in the pharmaceutical industry. On the contrary, the Complaint tells a very different story. As alleged in the Complaint, the distributors that Defendant chose to distribute Avonex are the three largest wholesalers in the industry. The Big Three generate an astounding 85 to 90 percent of all revenues from drug distribution in the United States. (*Id.* ¶ 34). The great majority of all pharmacies in the United States, including all of the large retail pharmacy chains, receive pharmaceuticals from these three wholesalers. (*Id.* ¶ 22). Hence, the allegations of the Complaint themselves suggest that Defendant's decision to distribute exclusively through the Big Three was not the poor business decision that Plaintiff argues that it was.

Second, even *assuming arguendo* that Defendant might experience a loss of revenue from the small, mostly rural, pharmacies, there is no reason amplified in the Complaint as to why Defendant could not recapture those sales through other distribution outlets. The allegations of the Complaint, again, do just the opposite. The allegations suggest that Avonex patients would find alternative means to obtain the drug for the treatment of their MS disease even if Avonex is unavailable at their local pharmacy.

For one, patients could "obtain the Avonex treatment that they require from a pharmacy supplied by the [Big Three]." (*Id.* ¶ 28). While Plaintiff alleges that some patients, particularly those that reside in rural areas, would have to travel "great distances" (*id.* ¶ 28), the allegations suggest that patients of Avonex would find a feasible way to do so. As alleged in the Complaint, Avonex has no comparable substitutes. (*Id.* ¶¶ 41-50). No other treatment for MS, including several drugs available on the market, can be effectively substituted for Avonex due to the allegedly unique characteristics of Avonex. (*Id.*)

Another alternative distribution outlet available to Avonex patients is evident from the allegations in the Complaint, namely, that Avonex treats a long-term condition and is capable of being self-administered. Avonex treats "patients with relapsing forms of multiple sclerosis ('MS')." (*Id.* ¶ 10). Avonex, in all of its formulations, was designed to be self-administered by the patient (or a non-medical caregiver); the Avonex Pen "was designed to improve a patient's ability to self-administer Avonex." (*Id.* ¶ 13).[9] Given these allegations, another obvious distribution outlet available to rural patients is mail-order distribution. It is no secret in the pharmaceutical industry that patients today can obtain pharmaceuticals for long-term conditions, such as MS, by mail order to their homes anywhere in the country. *Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 40 (D.D.C. 1998) ("Individuals today can fill their prescription drugs by

---

[9]     While the Complaint alleges that "[f]or many patients, Avonex is administered by licensed pharmacists in pharmacies" (Dkt. 1, Compl. ¶ 15), that does not mean that the drug cannot be administered by a non-medical person.

mail without going to a retail store or hospital. The dispensing of pharmaceuticals by mail order is the fastest growing segment of the industry.").

Third, even assuming that Defendant might see some residual loss from reluctant patients who decide not to purchase Avonex through alternative means, the Complaint does not attempt to quantify the extent of that loss. If anything, the Complaint (and in particular the allegations pertaining to the volume of business generated by the regional distributors) suggest that any such loss would be miniscule, at least from Defendant's perspective. The Complaint is riddled with allegations comparing the rather small volume of sales handled by the regional distributors to the substantial volume of sales generated by the Big Three. (Dkt. 1, Compl. ¶ 22 ("The [Big Three] distribute . . . Avonex, to a *great* majority of all pharmacies in the United States, including all the *large* retail pharmacy chains that service *larger* urban and suburban areas."); *id.* ¶ 23 ("[T]he [Big Three] focus their attention on *larger* pharmacies that have *substantial* volume requirements."); *id.* ¶ 24 ("Regional wholesalers, such as RDC, service *smaller* pharmacy chains and independent pharmacies, including those in urban, suburban, and rural areas of New York and other surrounding states. Many of these pharmacies *lack the volume* requirements upon which the [Big Three] insist before they will agree to supply a pharmacy.")). The Court cannot reasonably infer that Defendant's distribution plan negatively impacts Defendant's own economic interests without any quantification of the extent of Defendant's supposed losses.[10]

------

[10]    Upon its initial review of the Complaint, the Court was struck by the lack of quantification and absence of any specification concerning Plaintiff's own purchases

Fourth, and finally, Plaintiff's economic theory wholly ignores that there may be economic benefits and savings associated with using a national distribution plan. Plaintiff's allegations fail to account for the offsetting savings that Defendant might gain through the efficiencies offered by the national distributors. The Court can hardly reasonably infer the inimicality of Defendant's new distribution plan based only upon a projection of (unquantified) losses associated with the plan without any consideration of the associated savings, especially given that the reality in the pharmaceutical industry is that manufacturers are more and more using national wholesalers. (*Id.* ¶¶ 22, 34). Given the allegations of the Complaint, common economic experience, and simple common sense, the Court cannot accept Plaintiff's argument that its bald allegation that Defendant acted against its interest is sufficient to raise a plausible inference of conspiracy.

A similarly conclusory allegation of an unlawful arrangement led a district court in this circuit to dismiss a Donnelly Act claim in *Worldhomecenter.com, Inc. v. KWC Am., Inc.*, No. 10 CIV. 7781 NRB, 2011 WL 4352390, at *6 (S.D.N.Y. Sept. 15, 2011), which,

---

and sales of Avonex. In the Court's view, the reason that this information was absent from the Complaint was revealed by the information contained in Declaration of Kristi Paquette, filed by Defendant in opposition to Plaintiff's motion for preliminary injunction. According to Ms. Paquette, in 2014, Plaintiff purchased approximately 424 units of Avonex, which represents less than 0.1% (one-tenth of one percent) of Avonex sales last year. (Dkt. 20-1 at ¶ 10). Plaintiff does not dispute the accuracy of this information. While the Court does not consider Ms. Paquette's Declaration for purposes of deciding Defendant's motion to dismiss, and instead bases its decision on the four corners of the Complaint, the Court does agree with defense counsel's contention made at oral argument that this information is at least relevant for purposes of concluding that any dismissal must be with prejudice. In other words, Plaintiff is unable to point to any additional facts not contained in the Complaint which would cure the failure to allege an unlawful reciprocal arrangement, and indeed, the facts submitted by Defendant suggest the exact opposite.

although not cited by the parties, is instructive. There, the plaintiff brought suit against a manufacturer, claiming, *inter alia*, that an advertising policy was an unlawful restraint in violation of the Donnelly Act. *Id.* at *1, 6. The plaintiff alleged that the existence of agreements between the manufacturer and other distributors could be inferred because "without such agreements, the [policy] would not be in [the manufacturer's] own best interests." *Id.* at *6. The plaintiff claimed that the policy represented a *quid pro quo* in that the policy protected the remaining dealers from competition in exchange for the dealers' agreement to continue distributing the manufacturers' products. *Id.* The court disagreed, holding that the plaintiff had failed to allege sufficient facts from which joint action could be inferred. The court reasoned that "specific factual allegations of such an arrangement [wer]e absent from the complaint." *Id.* at *6-7. In addition, the court found that the allegations of the complaint did not adequately raise an inference that the policy was actually against the manufacturer's interests. *Id.* at *7. In that regard, the court gave some possible reasonable justifications that the defendant may have had for imposing the policy, but noted that the defendant was not obligated to offer any kind of a detailed explanation of its reasons. *Id.* at *6. Further, the court cited *Colgate* and the right of a manufacturer freely to exercise its own independent discretion as to the parties with whom it deals. *Id.*

As in *Worldhomecenter.com*, this Court cannot infer an arrangement between Defendant and the Big Three based only upon Plaintiff's bald contention that Defendant's adoption of its new distribution plan would be harmful to Defendant's own economic interests. Given the realities of the pharmaceutical industry and common economic

experience, there is insufficient factual information in the Complaint to support the sweeping allegation that Defendant adopted a distribution plan against its very own economic interests. Defendant may have reasonable justifications for the distribution plan, such as the offsetting cost savings and efficiencies offered by national distribution. Further, Plaintiff has not alleged adequate factual allegations from which an arrangement to restrain competition could be inferred. Absent such an arrangement, Defendant is protected under the cloak of the *Colgate* doctrine and can freely refuse to sell its products to a particular distributor or set of distributors.

Given the conclusory allegations of the Complaint, the Court is unwilling to make the inferential leap that Defendant and the Big Three formed an arrangement to restrain competition. As stated in *Worldhomecenter.com*, "that the [distribution plan] is mutually beneficial to [Defendant] and its [major] distributors is not an adequate factual allegation of agreement or conspiracy." *Id.* at *7.[11]

### 4. Alleged Reassurances

Plaintiff contends that it is implausible that Defendant would have made a decision to terminate Plaintiff's distributorships without first consulting the Big Three. (Dkt. 18

---

[11] Apart from the insufficiency of the allegations of Plaintiff's Complaint, the Court questions whether joint action can be inferred from the mere allegation that a plan is against a defendant's self-interest. A bare allegation that a corporate policy is against a single corporation's economic interest does not imply joint action in any way. If alleging that a business policy was contrary to a corporation's interests was enough alone to plead an antitrust conspiracy, a host of unilateral business decisions would be caught within the antitrust net. In the absence of factual allegations that raise a suggestion of bilateral action, Defendant's standalone disinterest in sales of Avonex to rural patients could be justified by any number of reasons, no one of which is made more plausible than the next by the allegations of the Complaint.

at 10-12). Building upon its argument that the distribution plan is against Defendant's economic interests, Plaintiff contends that Defendant "must have" obtained reassurances from the Big Three that they would be able to sell to the small and independent pharmacies. The Court has already rejected Plaintiff's conclusory allegation that Defendant's new distribution plan was against Defendant's economic interests in light of the allegations of the Complaint itself. Ergo, Plaintiff's related argument that Defendant "must have" made an arrangement with the Big Three to make Defendant's plan a financially viable one is equally unsound. While the Court could stop its analysis there, the Court concludes that Plaintiff's contention that Defendant had pre-termination discussions with the Big Three does not, in any event, allege an unlawful arrangement.

Plaintiff surmises that Defendant and the three distributors entered into one of the following three possible "arrangements" prior to the termination decision:

- [A]n arrangement between Biogen and the Three Wholesalers that would enable the latter to re-sell Avonex to at least some other regional distributors.[12]

- [A]n arrangement between Biogen and the Three Wholesalers that the latter would now sell Avonex to large chain pharmacies for re-sale to independent pharmacies.

- [A]n arrangement that the Three Wholesalers would alter their volume requirements so that independent pharmacies previously served by regional wholesalers like RDC could now purchase from the Three Wholesalers.

(Dkt. 18 at 11).[13]

---

[12] While all of these hypotheticals are discussed in Plaintiff's papers in opposition to Defendant's motion to dismiss (Dkt. 18 at 11), it appears that only the first hypothetical arrangement is alleged in the Complaint (Dkt. 1, Compl. ¶ 66).

Although Plaintiff contends that Defendant and the Big Three entered into one of these three arrangements, Plaintiff admits that it is "not privy to the exact nature" of the understanding. (Dkt. 18 at 11). More to the point, Plaintiff does not allege any factual matter whatsoever to support Plaintiff's argument that any of these theoretical possibilities actually occurred. As stated in *Twombly*, even though "a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions . . . ." 550 U.S. at 555. "What is required are 'enough facts to state a claim to relief that is plausible on its face.'" *Starr*, 592 F.3d at 321 (quoting *Twombly*, 550 U.S. at 570). The Court finds that Plaintiff's list of hypotheticals does not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

That Defendant and the Big Three may have exchanged information on prospective distribution strategy does not mean that Defendant was not making an independent termination decision regarding Plaintiff's distributorship. *See also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762-63 (1984) ("[The fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions."). To make out a claim under the Donnelly Act, Plaintiff must plead some factual matter to suggest that Defendant and the Big Three engaged in behavior that

---

[13]     As Plaintiff's list of theoretical possibilities grows, Plaintiff's assertion that Defendant "must have" engaged in discussions with the Big Three prior to terminating Plaintiff's distributorship becomes more attenuated. The more possibilities available to Plaintiff, the less likely pre-termination discussions were necessary, even under Plaintiff's conspiracy theory.

rose to the level of a reciprocal relationship of commitment.[14] *Du-Bro Foods, Inc. v. Aron Streit Inc.*, No. 2700/93, 1994 WL 874370, at *3 (Sup. Ct. May 18, 1994) (discussing in the context of a Donnelly Act claim that a conspiracy "must be proven by inferences from the behavior of the alleged conspirators"); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183-84 (2d Cir. 2012) ("[C]onspiracies . . . nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators."). The Complaint is devoid of any such facts, and Plaintiff's entire list of hypothetical discussions is based upon pure speculation. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (holding that allegations of conspiratorial activity "in entirely general terms without any specification of any particular activities by any particular defendant . . . was nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever").

The Court rejects Plaintiff's argument that several New York cases support its contention that the allegations in the Complaint constitute an "arrangement" under the Donnelly Act, including *Eagle Spring Water Co. v. Webb & Knapp, Inc.*, 236 N.Y.S.2d

---

[14]     Although not dispositive, the Court questions whether the Big Three would have been in a position to provide reassurances about the prospective purchase/sale transactions of third-party entities, like the regional wholesalers and the small pharmacies. In other words, even if the Big Three had agreed to lower their volume requirements or sell directly to regional wholesalers, the allegations of the Complaint indicate that there is some question as to whether these third parties would have had any financial incentive to purchase from the Big Three. As Plaintiff alleges, if Plaintiff and/or its pharmacy customers purchased from the Big Three, they would "be forced to sell Avonex at a loss due to the thin wholesale margins on drug sales." (Dkt. 1, Compl. ¶ 65).

266, 272, 277 (Sup. Ct. 1962) and *Alexander's Dep't Stores v. Ohrbach's, Inc.*, 266 A.D. 535, 538-39 (1st Dep't 1943) ("[S]ection 340 was intended to prevent the practice . . . whereby a larger competitor using the pressure of superior buying power seeks to eliminate . . . smaller competitors by seeking arrangements with manufacturers."). In both of these cases cited by Plaintiff, there was a reciprocal arrangement of commitment evidenced by economic pressure and promises of financial payments by one entity in exchange for another entity's promise to exclude a rival competitor.

In *Eagle Spring Water*,[15] a landlord of two buildings gave two water suppliers the exclusive right to supply water to the buildings. 236 N.Y.S.2d at 272. A competing water supplier filed suit against the landlord, seeking to enjoin the landlord from preventing it from supplying water. *Id.* at 269-70. In considering whether the conduct of the landlord and the exclusive suppliers was unlawful under the Donnelly Act, the court opined that the word "arrangement" as used in the statute "has a broader meaning than the words 'contract', 'agreement' or 'combination', and it may include each and all of these things and more—that is, all of the various acts, devices and agreements under which the participants are operating for the accomplishment of their purpose." *Id.* at 275. Turning to the evidence presented at trial, the court observed that the exclusive supplier operation included "pressures . . . exerted on [the landlord]-defendant by the exclusive

---

[15]     In arguing for a broad reading of the Donnelly Act, Plaintiff cites *Eagle Spring Water*, for the notion that giving a supplier "the exclusive right to provide . . . services" is an unlawful arrangement to restrain competition. (Dkt. 18 at 18). Plaintiff's proposition is an untethered overstatement of both the holding in *Eagle Spring Water* case and the scope of the Donnelly Act. *Eagle Spring Water* involved more than a unilateral provision of exclusive supplier rights, as further discussed herein.

suppliers . . . to exclude rival firms," an exchange of letters setting forth a schedule of commissions to be paid to the landlord by the suppliers for selecting them to serve on an exclusive basis, and efforts by the landlord to induce the tenants to use the exclusive suppliers. *Id.* at 272, 276. Based upon all of the evidence, the court held that the exclusive supplier operation constituted an "arrangement" within the meaning of the Donnelly Act and entered an injunction against the landlord. *Id.* at 276.

A supplier's use of pressure and financial inducements to exclude a rival was also the basis for the court's finding of a Donnelly Act violation in *Alexander's Dep't Stores*, 266 A.D. at 538-39. In that case, two clothing manufacturers terminated their long-time relationship with a retailer after acceding to the pressures of a rival retailer. *Id.* at 536-37. The rival retailer promised to make up any losses sustained by the manufacturers as a result of the termination through its own orders. *Id.* at 537. The terminated retailer sued the manufacturers and the rival, asserting a Donnelly Act violation against them. *Id.* at 536. The court held that the arrangement violated the statute explaining:

> A manufacturer has a right to pick his own customers and refuse to sell to a particular customer provided that such refusal is not the result of a combination with others to destroy competition so far as the whole product of important manufacturers is concerned. We think that section 340 was intended to prevent the practice that Ohrbach here engaged in, whereby a larger competitor using the pressure of superior buying power seeks to eliminate one by one smaller competitors by seeking arrangements with manufacturers, such as the one here in question, to refuse to sell to competitors and cut off their supply, though they have been buying the products and competing in them for years.

*Id.* at 539. Because the evidence in the record showed that the manufacturers' termination decision was not "freely" made but, instead, was the result of "pressure" and

financial promises from a rival supplier, the court reversed the judgment of the trial court and enjoined the defendants from carrying out the unlawful arrangement. *Id.* at 538-39.

The allegations in this case can hardly be compared to the evidence in *Eagle Spring Water* and *Alexander's Dep't Stores*. Here, there is no allegation that the Big Three exerted economic pressure on Defendant to discontinue Plaintiff's distributorship, no allegation that the Big Three offered financial payments to Defendant in exchange for Defendant's decision to terminate, and no allegation that the Big Three even complained to Defendant about Plaintiff's pricing or practices. The Big Three were already authorized by Defendant to sell Avonex to pharmacies and were already dominant national distributors for Defendant even prior to termination of the regional distributorships. (Dkt. 1, Compl. ¶ 51). While the Complaint speculates that Defendant could have modified its agreements with the Big Three to permit the Big Three to cross-sell to regional distributors (*id.* ¶ 66), nothing indicates that those modifications actually occurred, much less that they occurred before the termination decision as part of an illicit arrangement between Defendant and the Big Three. In the end, Plaintiff has simply failed to allege "enough factual matter (taken as true) to suggest that an [arrangement] was made." *Twombly*, 550 U.S. at 556.

In conclusion, due to the absence of allegations suggestive of an unlawful reciprocal relationship of commitment, the Court concludes that the allegations of the Complaint do not state a claim to relief that is plausible on its face.[16] Accordingly, the

---

[16]     Because the Court concludes that Plaintiff has not alleged an unlawful arrangement that violates the Donnelly Act, the Court need not consider the questions of

Donnelly Act claim in the first cause of action in the Complaint is dismissed with prejudice.

## III.   Remaining Claims

As Plaintiff acknowledged at oral argument, the remaining claims in the Complaint are premised on Plaintiff's assertion that Defendant's conduct violated the Donnelly Act and/or was the result of a bad-faith arrangement with the Big Three. Plaintiff asserts the following additional claims: injunctive relief under N.Y. CPLR 6301 (second cause of action); anticipatory breach of contract based upon Defendant's anticompetitive arrangement (third cause of action); breach of the covenant of good faith and fair dealing (fourth cause of action); and declaratory relief under N.Y. CPLR 3001 that Defendant violated the Donnelly Act (fifth cause of action).  Because Plaintiff has not adequately pled a claim for relief under the Donnelly Act or any other bad-faith arrangement with the Big Three, the remaining claims must be dismissed.

---

whether Plaintiff has successfully alleged a single-brand market or anti-competitive effects.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (Dkt. 6) is granted, and Plaintiff's Complaint (Dkt. 1) against Defendant is dismissed with prejudice. Plaintiff's motions for preliminary injunction (Dkt. 9, 15) are denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: September 18, 2015
       Rochester, New York